UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA


BRIAN A. DAVIS,
FREDRICKA K. BECKFORD,

        Plaintiffs,

      v.

THE GEO GROUP, Inc.;
DAVID O'NEAL, Northeast Regional
Director, Department of Homeland Security;
ADMINISTRATOR, Bureau of Prisons
Privatization Management Branch;
G.C. Wigen, Former Warden,
Moshannon Valley Correctional Center,

        Defendants.
_____/

Civil Action
Case No. 3:16-cv-00026

Honorable Cynthia Reed Eddy
United States Magistrate Judge

**COMPLAINT SEEKING DAMAGES
AND DECLARATORY RELIEF**

# FILED

FEB 2 2 2016

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## AMENDED COMPLAINT

Plaintiffs Brian A. Davis and Fredricka K. Beckford (hereinafter "Plaintiffs" unless otherwise stated), alleges the following:

## I. GENERAL ALLEGATION

1.   This is an action based on civil rights violation and violation of Plaintiffs' constitutional and statutory rights as defined under the United States Constitution, the Pennsylvania Constitution, and federal and state law. Generally, this civil action addresses violation of constitutional rights committed by the named Defendants---rights guaranteed by the First, Fifth, Tenth and Fourteenth Amendments to the United States Constitution, (42 U.S.C. §§ 1981, 1983, 1985, and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971); rights secured under Title VI, § 601 of the Civil Rights Act of 1964 (42 U.S.C.

§§ 1983 and 2000 et seq.); civil rights violation under 28 C.F.R. § 42.104(b)(2) and 45 C.F.R. § 3.6; and violation under Article I, §§ 3, 26 and 7102 of the Pennsylvania Constitution based on the named Defendants' intentional infliction of emotional distress upon the Plaintiffs. (§ 7102).

2.    The Plaintiffs in this suit were discriminated against, and are continuing to be discriminated against, based on their race and national origin by the actions, omissions, policies, practices, and customs of the named Defendants as explained below.

3.    The allegations set forth below are based on the Defendants' conduct in depriving Ms. Beckford and Mr. Davis of their constitutional right to marry, and doing so in violation of Ms. Beckford's and Mr. Davis' civil rights.

## II. **JURISDICTION AND VENUE**

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and its inherent equitable power to remedy constitutional wrongs because the allegations set forth here arise under the Constitution and laws of the United States.

5.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 since Ms. Beckford is a resident of the State of Georgia, Mr. Davis is currently residing in the State of Pennsylvania, the violations and resulting injury alleged here originated in the State of Pennsylvania, two of the named Defendants are either employed in the State of Pennsylvania or reside in the state, another is based in Washington, DC, and the other is based in the State of Florida.

6.    Jurisdiction is also proper under 28 U.S.C. § 1367 as this action also seeks redress under the Pennsylvania Constitution.

7.    This Court has the authority to grant declaratory relief pursuant to

2

28 U.S.C. §§ 2201 and 2202.

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred, and continues to occur, in this district.

### III. **THE PLAINTIFFS**

9.    Plaintiff Brian A. Davis is a federal prisoner committed to the custody of the Federal Bureau of Prisons (BOP).  The BOP, as part of its Intergovernment Agreement with commercial sources, ceded custody of Mr. Davis over to the Geo Group, Inc., a private corporation under contract with the BOP to house federal prisoners at its privately operated prisons. (See, 18 U.S.C. § 4002).  The Moshannon Valley Correctional Center (MVCC) is one of the many privately operated prisons owned by the Geo Group, Inc.  Mr. Davis is currently confined at MVCC, which is located at: 555 Geo Drive; Philipsburg, Pennsylvania 16866.

10.    Plaintiff Fredricka K. Beckford is Mr. Davis' fiancee and have known Mr. Davis since childhood.  Ms. Beckford currently resides in the State of Georgia.

### IV. **THE DEFENDANTS**

11.    The Geo Group, Inc ("Geo"), at all times relevant to this action, owns and operate MVCC and other private prisons.  The BOP, which is a branch within the United States Department of Justice (DOJ) clothed with the authority to execute federal prison sentences that have been imposed upon defendants convicted of federal offenses and sentenced to a term of imprisonment by the various federal district courts created under Article III (28 U.S.C. § 636(b)(1)(A)), as part of its prerogative under 18 U.S.C. § 4002 to delegate its penological responsibilities and duties, entered into a contractual agreement with Geo that

allowed Geo to house defendants serving federal sentences at its MVCC facility. In return, the Federal Government agreed to financially compensate Geo based on specific terms entered into the contract by a Contracting Officer (also a Government employee) who is empowered to negotiate, award, administer, cancel or terminate contracts on behalf of the United States Government.  The monetary compensation that Geo receives from the Federal Government for housing federal prisoners at its private facilities is based, in part, on a daily official inmate count that is subject to a fixed incremental unit price that applies when the number of inmate days within the monthly payment period exceeds an average daily population.

12.    As stated, the contract awarded to Geo by the BOP through its Contracting Officer (CO) allows Geo, under the terms of the contract defined by the CO under the direction of the BOP Director, to utilize its facilities as placement centers for federal prisoners committed to the custody of the BOP to serve federal prison sentences.  The contract awarded to Geo is part of a program instituted by the Federal Government to reduce crowding in BOP operated facilities.

13.    In operating its facilities, the terms of the contract between Geo and the BOP allows Geo a certain amount of latitude to design and implement institutional programs, program statements, services and policies separate from those listed in the BOP Program Statements.  However, despite this concession of limited autonomy, a provision of the contract between Geo and the Federal Government entitled "Strict Compliance" mandates that Geo comply with, (a) all services and programs listed as part of the contract's statement of works; (b) the United States Constitution; (c) all applicable Federal, state and local laws and regulations; (d) applicable Presidential Executive Orders; and (e) all

4

applicable case law, consent decrees, and Court Orders.  The agreement further states that should a conflict exist between any of the aforementioned standards, the most stringent shall apply, and the contractor shall comply with and implement any applicable changes to BOP policy, Department of Justice regulations, Congressional mandate, and Federal law.  Geo's corporate headquarters is located at: One Park Place, Suite 700; 621 Northwest 53rd Street; Boca Raton, Florida 33487.

14.    Defendant David O'Neal ("Defendant O'Neal"), at all times relevant to this action, is the Director of the Northeast Regional Field Office for the Department of Homeland Security (DHS).  Defendant O'Neal supervises the various DHS attorneys and Immigration and Customs Enforcement field agents assigned to enforce and execute immigration laws, policies and regulations in the Northeast region of the country.  Defendant O'Neal's place of employment with DHS is located in Philadelphia, Pennsylvania.

15.    The Administrator of the BOP Privatization Management Branch ("Defendant Administrator"), at all times relevant to this action, is authorized to administratively resolve disputes between federal prisoners housed at MVCC and the staff employed by Geo to operate MVCC on a daily basis.  Defendant Administrator's authority to resolve these disputes is conducted through a unique administrative remedy process that is initiated by the inmate at MVCC through a multi-layered filing system designed by Geo and implemented by its MVCC personnel.  Defendant Administrator heads the Correctional Programs Division within the BOP which is responsible for monitoring the operational activity of the various private facilities under contract with the BOP to ensure proper conformance with BOP policy and Program Statements.  Defendant Administrator's place of employment with the BOP is located in Washington, DC at: 320 First

Street, N.W., Building 400; Washington, DC 20534.

16.     Defendant G.C. Wigen ("Defendant Wigen"), at all times relevant to
this action, was the warden at MVCC from around March of 2013 to November of 2015.

## V. FACTUAL ALLEGATION

17.     Ms. Beckford and Mr. Davis have known each other since they were
teenagers.  Even though they were kids when they met, knew very little about
life, themselves, and the world in which they lived, they both knew from the
very beginning that they were destined to be together.  That knowingness, however,
was severely tested when Mr. Davis self-surrendered to federal authorities at
his job-site in Queens, New York, on October 14, 1992---two weeks after his 21st
birthday, and was sent to federal prison where he has been ever since.
Incidentally, the adversity underlying Mr. Davis' confinement which was designed
to tear Ms. Beckford and Mr. Davis apart became the catalyst behind the lifelong
bond that they have forged through the nearly two-and-a-half decades of Mr. Davis'
incarceration.

18.     In 1993, Mr. Davis was convicted in the United States District Court
for the Northern District of Texas of conspiracy to possess with intent to
distribute 50 grams or more of cocaine base (crack cocaine), in violation of
21 U.S.C. §§ 841(a), 841(b)(1) and 846.  He was found to have been involved in
the conspiracy over a two-year period when he was only seventeen and nineteen
years old.  Of those two years, Mr. Davis spent more than a year in county
detention.

19.     At sentencing, the district court imputed to Mr. Davis amounts of crack
cocaine that the district court determined had been possessed by other members
of the conspiracy, concluding that on this basis 23 to 41 kilograms of crack
cocaine could be attributed to Mr. Davis.

20.   Under the Sentencing Guidelines in effect at the time, this quantity yielded a base offense level of 42.  The district court then applied enhancements that increased Mr. Davis' offense level to 46, which the court then reduced to a final offense level of 43 for sentencing purposes.  Mr. Davis was assigned a criminal history category of II.  When combined with a total offense level of 43, Mr. Davis' Guideline sentencing range was mandatorily set at life imprisonment.  Accordingly, the district court sentenced Mr. Davis to a term of life imprisonment without the possibility of parole.

21.   Following Mr. Davis' sentencing, the BOP designated him to serve his sentence at a medium-high security level Federal Institution located in Bradford, Pennsylvania (FCI McKean).  Under BOP custody classification protocol, Mr. Davis' life sentence mandated that he could not be housed at a facility rated below a medium-high security level.

22.   Mr. Davis spent the next 18 years confined at FCI McKean.  The difficulty that Ms. Beckford and Mr. Davis faced in cultivating and maintaining a committed relationship inhered in the fact that Mr. Davis was serving a mandatory life sentence with virtually no hope of relief in sight.  Moreover, the difficulty that the couple faced was further compounded by the fact that in order for Ms. Beckford to spend time with Mr. Davis, she would have to embark on an arduous six-hour commute each way to and from the prison to visit Mr. Davis, which presented its own set of challenges.  Nevertheless, Ms. Beckford and Mr. Davis persevered through the storm, believing that the life that they envisioned together and strove to attain would one day manifest itself before them.

23.   While Mr. Davis was incarcerated at FCI McKean, he and Ms. Beckford seriously considered consummating their lifelong commitment to each other by getting married through the marriage program offered at the facility.  However, despite the fact that Ms. Beckford was not discouraged by the looming cloud of

uncertainty that distorted the couple's hopes of one day being able to enjoy a life together, Mr. Davis remained uneasy about allowing Ms. Beckford to take the ultimate leap of marrying him while a life sentence continued to define his existence.  So he made the decision then not to get married---a decision, though seemingly logical on its face, was nevertheless difficult for Mr. Davis to explain to a woman who refused to look elsewhere to replicate the love that she has for him.

24.   On June 19, 2008, the district court reduced Mr. Davis' life sentence to 30 years in response to a petition filed by Mr. Davis under 18 U.S.C. § 3582(c) based on Amendment 505 to the Federal Sentencing Guidelines.

25.   Once Mr. Davis' sentence was reduced from life imprisonment, his projected release date became December 1, 2018.  Likewise, his custody classification also changed which allowed him to be transferred to a low-level security BOP facility or a Federal prison camp.

26.   After more than a decade of confinement, Mr. Davis was no longer plagued with the weight of uncertainty that prevented him from reaching for a future that included him and Ms. Beckford being together.  For the first time he had a release date, which brought with it a sense of hope that what once seemed unlikely and frustratingly elusive had a chance of becoming.  Marriage, along with other personal matters, became the focus between Ms. Beckford and Mr. Davis. And with the reduction in Mr. Davis' sentence came the opportunity for him to transfer to a different BOP facility that was close to Ms. Beckford and the rest of his family.  However, although Mr. Davis and Ms. Beckford considered marrying at FCI McKean, they ultimately decided to wait until Mr. Davis transferred to a BOP facility close to home so that the stress of traveling hours to FCI McKean would not become a hindrance for family members who wanted to attend the ceremony and who, on other occasions, generally disliked embarking on the grueling six-

hour commute each way to visit with Mr. Davis.

27. Thereafter, Mr. Davis submitted a request to FCI McKean staff to be transferred to a low-level security BOP facility in order to be close to his family. As part of a mandatory semiannual program review of every federal inmate committed to the custody of the BOP, inmates who have maintained a clear prison conduct, scored satisfactory or above on work assignment evaluation, and continued to participate in educational programs, are afforded the option during their program review of choosing a particular BOP facility to which they would like to be re-designated. Because Mr. Davis scored well above satisfactory in every category that assessed his progress, he requested to be transferred to FCI Fort Dix, a BOP operated facility that is located in New Jersey close to his family. Based on Mr. Davis' request to be transferred to Fort Dix, the plan was that Ms. Beckford, who originally lived in New York, would re-locate to New York.

28. Several weeks after Mr. Davis submitted his request to be transferred, he was told by his case manager at FCI McKean that his transfer to FCI Fort Dix had been approved.

29. In or around April of 2012, Mr. Davis was taken from FCI McKean under the BOP's transfer procedure to be delivered to his re-designated facility. Unbeknownst to Mr. Davis, while he was being held at a hold-over facility, BOP personnel changed his designated facility from FCI Fort Dix to MVCC, the private facility owned and operated by Geo. (This is the information that was given to Mr. Davis while he was on hold-over status at the BOP operated Metropolitan Detention Center in Brooklyn, New York). The change in designation essentially defeated the objective of Mr. Davis requesting to be housed at a facility that is located close to his family.

30. Mr. Davis arrived at MVCC on June 1, 2012.

31. While Mr. Davis' projected release date was still December 1, 2018, he

submitted a written request to MVCC administrative staff on behalf of Ms. Beckford
and himself asking that preparations be made to allow him and Ms. Beckford to
get married.  Ms. Beckford later submitted a written request of her own to MVCC
administrative personnel also asking that preparations be made to allow her and
Mr. Davis to get married.

32.   The written response that Mr. Davis received from MVCC administrative
personnel, the last of which came from Defendant Wigen, was that he will not
be allowed to marry.

33.   MVCC's policy statement on marriage lists several factors that the
inmate is required to meet in order to obtain approval from MVCC warden to marry.
High among those factors are six months of clear prison conduct and participation
in an educational program.

34.   While there is no legal basis to restrict either Ms. Beckford's or
Mr. Davis' fundamental constitutional right to marriage (or their right under
42 U.S.C. § 1981 to engage in such contractual arrangement) based on whether
Mr. Davis participates in an institution-sponsored educational program taught
by fellow inmates or on the basis of a minor infraction, at the time Mr. Davis
and Ms. Beckford submitted their respective requests to marry, Mr. Davis was
in full compliance with all the factors listed in MVCC's policy statement on
marriage.  Nevertheless, the couple's requests to marry were summarily denied.

35.   Once Mr. Davis' request to marry was denied, he challenged the denial
through the available administrative remedy process, ultimately bringing the
matter to the attention of Defendant Administrator asking that s/he intervene
to protect Mr. Davis' and Ms. Beckford's constitutional right.  In response,
Defendant Administrator disregarded Mr. Davis' request by informing him in a
written correspondence that the matter was exclusively for MVCC personnel to
resolve, essentially sending Mr. Davis back to the very source of the

constitutional violation that he and Ms. Beckford suffered.

36.    In August of 2015, the district court in which Mr. Davis was sentenced granted a § 3582(c)(2) petition filed by counsel for Mr. Davis which sought a reduction in Mr. Davis' sentence based on the recently promulgated Amendment 782 to the Federal Sentencing Guidelines.  The district court's Order reduced Mr. Davis' 30-year sentence to 27 years.  Once the Order was received by the BOP, the BOP's recalculation of Mr. Davis' projected release date came out to be April 20, 2016.

37.    Since MVCC was acquired by Geo and began receiving Federal funding to house Federal inmates, of the myriad inmate requests to marry that have been submitted to MVCC administrative personnel, no inmate has ever been allowed to marry while in the custody and under the supervision of MVCC.  The reason for this striking number of denials points to one logical explanation: The inmate population at MVCC comprise of foreign nationals deemed to be non-violent offenders with low-level security classification serving federal sentences.  Roughly 98% (if not all) of the inmates housed at MVCC are faced with an impending immigration matter or have been ordered deported from the United States.  And because there is a virtual Immigration Court within MVCC, DHS is able to commence removal proceedings while the inmate is serving his federal sentence.

38.    Because of the drastic consequences of deportation that typically include permanent separation from children, current and future spouses, and other family members and loved ones, along with the prospect of being sent to a distant country where the alien-inmate oftentimes has no ties and/or family support, majority of the MVCC alien-inmates usually move to challenge DHS's efforts to remove them permanently from the country.  And a huge part of mounting an effective challenge is being able to say that one is married to a United States citizen, which in turn enables the alien-inmate to claim certain relief from

deportation that otherwise would not have been available to him.

39.   Because of this eventuality, Geo, through its personnel at MVCC, works closely with Defendant O'Neal and his subordinates to ensure that the alien-inmates confined at MVCC do not succeed in marrying because of the impediment that marriage to a United States citizen poses to the removal process.

40.   In Mr. Davis' and Ms. Beckford's case, marriage between them does not provide Mr. Davis with any option of claiming relief from deportation under the Immigration and Nationality Act (INA) because of how Mr. Davis' drug conviction is classified under the INA.   Nevertheless, it is the facially neutral policy created by both DHS and Geo which bar MVCC inmates from marrying through selective enforcement practices executed and maintained by MVCC personnel (in this case, Defendant Wigen) that has, and continues to, be used to prevent Mr. Davis and Ms. Beckford (and every other MVCC inmate who desires to be married) from exercising their constitutional right to marry.   The national origin of Mr. Davis and Ms. Beckford, along with ensuring that Mr. Davis does not obtain any relief from deportation through marrying Ms. Beckford who is a United States citizen, were (and continues to be) the motivating factors in the institution of a policy and practice at MVCC designed not only to suppress the Plaintiffs' right to marry, but also maintain Mr. Davis' status as an inmate at MVCC because of the financial incentives realized by Geo for each day Mr. Davis remain confined at MVCC.   This is so because relief from deportation also provides the alien-inmate with the opportunity to transfer from MVCC to a BOP operated facility where access to community re-entry programs are then made available.   Otherwise, the alien-inmate will be forced to serve his entire prison term at MVCC.

41.   Moreover, based on the Defendants' negative personal view towards foreigners, in denying Mr. Davis and Ms. Beckford their constitutional right to marry, the Defendants have collectively decided that there is no need or reason

to expend resources in allowing Ms. Beckford and Mr. Davis to marry while Mr. Davis is confined at MVCC because Ms. Beckford and Mr. Davis marrying in America, in the Defendants' view, would be immaterial since Mr. Davis will be deported. Therefore, according to the Defendants' reasoning, since the couple will be able to marry anyway upon Mr. Davis' arrival in his native country, there is no harm in precluding the couple from marrying while Mr. Davis is in MVCC custody.  Such reasoning, which is rooted in racial discrimination and prejudice, along with DHS's objective of precluding MVCC alien-inmates from claiming relief from deportation through marriage to a United States citizen, and Geo's financial incentive in prolonging Mr. Davis' (and other MVCC inmates) custody within its facility while assisting DHS in executing its deportation objectives, have been the cogent behind the violation that Ms. Beckford and Mr. Davis suffered, notwithstanding the fact that Mr. Davis does not have a deportation order issued against him and he has been living in the country as a lawful permanent resident.

42.   Ms. Beckford and Mr. Davis have been intentionally discriminated against by Defendants Geo, O'Neal, Administrator, and Wigen based on their race and national origin.  If Mr. Davis were an American citizen, provisions would have been made a long time ago for he and Ms. Beckford to marry---an allegation that is validated by the fact that Mr. Davis had no problems with marrying Ms. Beckford while he was housed at FCI McKean.  And if Ms. Beckford were not black and of Jamaican decent, her right to marry would have been handled with dignity, and efforts would have been made to protect her right.  In that sense, Geo and Defendants O'Neal and Administrator failed to meet their supervisory, monitoring, and compliance procedural obligations that federal law has imposed upon them.

43.   Defendants Wigen and Administrator did not merely have knowledge of and acquiescence in the execution of the discriminatory policy, practice and custom alleged here, they also adopted and, in the Plaintiffs' case, implemented

the discriminatory practice, policies and custom at issue for the purpose of discriminating against the Plaintiffs on account of their race and national origin, and ultimately to ensure a financial benefit.

44.   Defendants Geo and O'Neal created the discriminatory policy and practice of precluding alien-inmates confined at MVCC from marrying; the preclusion is based on the alien-inmates' (and their potential spouses') national origin and race; Defendants Geo and O'Neal promulgated the discriminatory policy and practice; and Defendants Wigen and Administrator implemented the discriminatory policy and practice.  All the named Defendants share responsibility for the continued enforcement operation of the discriminatory policy and practice which subjects (and causes to be subjected) the Plaintiffs to a constitutional deprivation.

45.   The emotional distress that the Plaintiffs in this case suffered is one that cuts deeper than it would have otherwise been due to the circumstances that led to Mr. Davis' life sentence and the two-and-a-half decades of imprisonment that he and Ms. Beckford have endured, the result of which essentially prevented the couple from pursuing the goals of happiness that the United States Constitution guarantee to every person lawfully residing in the country.  Therefore, for context, it is necessary to outline those circumstances here in order to convey the depth of how injurious the Defendants' actions have been on the Plaintiffs.

46.   The evidence upon which Mr. Davis' drug conspiracy conviction rests consist of Mr. Davis being said to have generated in excess of $100 million selling crack cocaine when he was 17 years old, even though no evidence was presented to support that allegation---i.e., no evidence that Mr. Davis has ever owned or purchase anything of value in his entire life; no evidence that Mr. Davis was ever found to be in possession of any drugs or substantial amount of

cash at anytime in his life to justify him being responsible for generating in excess of $100 million in drug proceeds; and no evidence that the conspiracy in which Mr. Davis was charged did in fact engaged in such large-scale drug distribution.

47.   The evidence supporting Mr. Davis' conviction further rests on an allegation that the conspiracy's purported leader once instructed Mr. Davis to smuggle crack cocaine from New York to Dallas, Texas, and on another allegation that Mr. Davis and three co-conspirators, on a different occasion, smuggled drugs from New York to Dallas hidden in a car that was being driven by Mr. Davis which was pulled over by the police along the way who searched the car but did not discover the drugs, but went on to issue Mr. Davis three traffic citations.

48.   As to the first of the two foregoing allegations, irrefutable evidence has been established showing that Mr. Davis and the conspiracy's purported leader had never met, never had any conversation, and knew absolutely nothing about each other's existence.  And as to the second allegation, all three co-conspirators who were allegedly in a car being driven by Mr. Davis that smuggled drugs from New York to Dallas and was pulled over by the police en route testified against Mr. Davis at his trial.  One of the three co-conspirators testified that this event occurred.  The other two, however, had no knowledge of the event taking place even though they were said to have been in the car. Moreover, none of the three traffic citations that were supposedly issued to Mr. Davis could be found.

49.   Another co-conspirator testified that Mr. Davis, a seventeen year old, had established connection with a cocaine supplier who supplied the conspiracy with cocaine.  The conspiracy in which Mr. Davis was charged listed 61 co-conspirators.  Several of the key members of the conspiracy who were in leadership positions testified about where they obtained their cocaine from.  And not once

did any of them mentioned that Mr. Davis was a source of cocaine for the conspiracy. Moreover, other key members of the conspiracy testified that they disliked and distrusted Mr. Davis and admitted to attempting to kill him on several occasion. These things notwithstanding, Mr. Davis was said to have supplied these individuals and the rest of the conspiracy with cocaine obtained through a fictitious source. Even more telling, of the 61 people charged in the conspiracy, no one (including Mr. Davis) knew about the fictitious cocaine supplier through whom Mr. Davis supposedly relied on to supply the conspiracy with cocaine. This allegation was introduced through the testimony of a co-conspirator who admitted during cross examination to attempting to kill Mr. Davis on two occasions.

    50.    Other evidence introduced involved a Dallas police officer who was part of a drug trafficking investigation for which his partner was prosecuted (this information was kept from the jury) testifying that on April 22, 1989, he and his partner (the same partner prosecuted for drug trafficking) encountered Mr. Davis and a co-conspirator in an apartment with a quarter kilogram of cocaine and $17,000 in cash. According to the officer, Mr. Davis was not arrested. However, Mr. Davis' jail record conclusively shows that not only was he not in an apartment on April 22, 1989 with a quarter kilogram of cocaine and $17,000 in cash as the police officer testified to, but he had been in jail prior to April 22, 1989 based on a traffic violation and remained in confinement through and after April 22, 1989 which establishes that unless Mr. Davis has a twin sibling, he could not have been in two places at the same time. Moreover, in consideration of the fact that every single co-conspirator named in the case (except for Mr. Davis and two other co-conspirator who proceeded to trial and who Mr. Davis had never met prior to trial) pled guilty and agreed to testify on behalf of the Government, none provided any statement or testimony attesting to having been

in an apartment with Mr. Davis on April 22, 1989 where drugs and money were
discovered; nor were there any explanation provided as to why Mr. Davis was not
arrested.  Unfortunately for Mr. Davis, the jury was not made aware of this
information.

51.   Finally, it was alleged that Mr. Davis moved one of the conspiracy's
workers from one drug distribution outlet to another in September of 1990.  This
allegation not only contributed to Mr. Davis' conviction, but it also served
as the Government's sole basis for establishing that Mr. Davis exerted a certain
level of supervision over the low-level members of the conspiracy, which in turn
led to him receiving a leadership role enhancement at sentencing.  What the jury
was not told, however, was that the worker who Mr. Davis had allegedly moved
from drug distribution outlet to another in September of 1990 was never in Dallas
at any time during 1990---a fact that is supported by irrefutable evidence.

52.   The evidence that comprises Mr. Davis' drug conspiracy conviction,
his life sentence and subsequent 30-year and 27-year sentences, and his more
than two decades of incarceration have essentially been discredited.  Indeed,
to say that what occurred in Mr. Davis' case is an injustice would be an
understatement.  Still, Mr. Davis and Ms. Beckford persevered and suffered through
the pain and adversity that Mr. Davis' incarceration has caused, all the while
being told that what occurred in Mr. Davis' case is a reality that has no place
in our nation's present, or its future.  Yet here we are.

53.   The fact that Ms. Beckford and Mr. Davis continues to live through
a tragic experience that continues to devolve into something worse despite the
struggles that the couple have already endured indicates that there isn't much
in the spirit of change or progress that separates our sordid past from a future
that embraces solidarity and advancement in racial matters that we are taught
represent the core values of our nation.  The Defendants named in this complaint

not only engaged in acts of discrimination against Ms. Beckford and Mr. Davis based on their nationality and race in their acts of preventing the couple from marrying, but they did so with deliberate indifference to, and complete disregard for, Ms. Beckford's and Mr. Davis' civil, constitutional, and statutory rights.

54.    The United States Supreme Court has explained that the right to marry is a fundamental right inherent in the liberty of the person, that marriage is one of the vital personal rights essential to the orderly pursuit of happiness, and that under the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments, couples may not be deprived of that right and that liberty. The Court went on to explain that the right to marry is of fundamental importance for all individuals, and that decisions concerning marriage are among the most intimate that an individual can make.  The Court concluded by stating that when the right to marry is violated due to an unlawful exercise of governmental power, the Constitution requires redress by the courts.

55.    In the Defendants' view, neither Ms. Beckford nor Mr. Davis have the right to marry each other while Mr. Davis is an inmate at MVCC because neither the Constitution's precept on marriage nor the guarantee of civil and statutory rights applies to Mr. Davis who will be deported from the United States.  The Plaintiffs' right to marry was deliberately and indifferently suppress by the Defendants named herein who acted with wanton disregard for the emotional and psychological turmoil that their conduct have had (and is continuing to have) on the Plaintiffs and the demeaning affect that their arbitrary denial of one of the most fundamental rights guaranteed by the United States Constitution will have on the Plaintiffs because of their national origin and race.

## VI. **LEGAL THEORY**

56.    Title VI of the Civil Rights Act provides that "[n]o person in the

18

United States shall, on the ground of race, color, or national origin, be excluded
from participation in, be denied the benefits of, or be subjected to
discrimination under **any** program **or** activity receiving federal financial
assistance." 42 U.S.C. § 2000d (emphasis added).  Pursuant to § 602 of the Act,
federal agencies and departments responsible for awarding and administering
federal contracts promulgated regulations prohibiting federal contractees from
adopting policies (including those that limit benefits or services on ostensibly
race-neutral grounds but have the predictable and intended consequences of
materially benefiting some races at the expense of others) that have the effect
of discriminating on the bases listed under Title VI.  Geo receives federal
funding from the Federal Government based on its contractual agreement with the
Federal Bureau of Prisons and is thus subject to the restrictions of Title VI.

57.   As discussed in paragraph 13, supra, a provision in the contract
between Geo and the Federal Government mandates that Geo, inter alia, comply
with all applicable Federal, state and local laws and regulation, all applicable
case law, and the United States Constitution.

58.   Title 42 U.S.C. § 1981 provides a private cause of action for
discrimination by private actors and discrimination under color of state law.

59.   Title 42 U.S.C. § 1983 provides a right of action against any "person
who, under color of any statute, ordinance, regulation, custom, or usage, of
any State or Territory or the District of Columbia, subjects, or caused to be
subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws." Id.  Under Bivens v. Six Unknown Fed.
Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 LEd.2d 619 (1971), a similar
cause of action is available against any person acting under color of federal
law.

60.   Title 42 U.S.C. § 1985 provides a cause of action against parties
that, under color of law, conspired to deprive any person within the
jurisdiction of the United States of any rights, privileges, or immunities secured
by the Constitution and laws of the United States.

61.   The Constitution's Equal Protection Clause proscribes selective
treatment and selective enforcement of and against persons who are similarly
situated.

62.   Title 45 C.F.R. § 3.6 provides that a person may not discriminate
by segregation or otherwise against another person because of age, color, creed,
handicap, national origin, race or sex, in furnishing or by refusing to furnish
to that person the use of any facility of a public nature, including all services,
privileges, accommodations, and activities provided within the district.

63.   Article I, § VI of the Pennsylvania Constitution bars discrimination
against Plaintiffs in the exercise of their civil rights.  Article I, §§ 3 and
26 allows for injunctive and declaratory relief.  And under Pennsylvania
Constitution § 7102, a right of action exist for intentional infliction of
emotional distress.

64.   Title 28 C.F.R. § 42.104 prohibits recipients of Federal funds from
discriminating against any person on the grounds of race, color, or national
origin.

## VII.  <u>PLAINTIFFS' INJURY</u>

65.   Defendant Wigen, in his individual capacity and under color of law,
violated Plaintiffs' right under Title VI of the Civil Rights Act not to be
discriminated against based on their national origin;  Plaintiffs' First and
Fourteenth Amendment right to marry and not to have their right to marry
encroached upon based on their race, national origin, or any other impermissible

bases not authorized by law; Plaintiffs' constitutional right to equal protection under law in that Plaintiffs have been deprived of their right to marry even though individuals in similar circumstances as Plaintiffs have had their right to marry protected; Plaintiffs' right under 42 U.S.C. § 1983 not to be deprived of a constitutionally protected right, not to be discriminated against, and not to be treated differently from other individuals similarly situated; the directives set forth under 28 C.F.R. § 42.104(b)(2) and 45 C.F.R. § 3.6 which proscribe acts of purposefully discriminating against Plaintiffs based on their race and national origin; intentional infliction of emotional distress upon Plaintiffs in violation of Pennsylvania's Constitution (42 Pa. Const. Stat. § 7102); Plaintiffs' right under 45 C.F.R. § 3.6 to access facilities of a public nature, including all services, privileges, accommodations, and activities provided within the district; and Plaintiffs' right under 42 U.S.C. § 1981 to enter into the contractual agreement of marriage, to be afforded the same access as white persons to the local courthouse (a public place) in the district where MVCC is located in order to secure a marriage license, and not to have their rights impaired based on discriminatory practices.  Ms. Beckford wrote to MVCC personnel expressing her desire to marry Mr. Davis and asked that arrangements be made to allow her and Mr. Davis to marry.  That request, however, was summarily denied.  This violation caused Plaintiffs significant pain and suffering by depriving them of a fundamental right inherent in their liberty as individuals within the jurisdiction of the United States---that personal right essential to the orderly pursuit of happiness, by causing them emotional distress, and by causing them substantial prejudice.

66.   Defendant Geo, acting under color of law, violated Plaintiffs' right under Title VI of the Civil Rights Act not to be discriminated against based on their national origin; Plaintiffs' First and Fourteenth Amendment right to

marry and not to have their right to marry encroached upon based on their race, national origin, or any other impermissible bases not authorized by law; Plaintiffs' constitutional right not to be subjected to discriminatory practices, policy or customs, of which was put into place at MVCC by Geo and Defendant O'Neal for the purpose of preventing Plaintiffs from claiming any statutory benefits that would otherwise be available to them; Plaintiffs' constitutional right to equal protection under law in that Plaintiffs have been deprived of their right to marry even though individuals in similar circumstances as Plaintiffs have had their right to marry protected; Plaintiffs' right under 42 U.S.C. § 1983 not to be deprived of a constitutionally protected right, not to be discriminated against, and not to be treated differently from other individuals similarly situated; conspiring with Defendant O'Neal to interfere with, and deprive Plaintiffs of, their civil rights, in violation of 42 U.S.C. § 1985; the directives set forth under 28 C.F.R. § 42.104(b)(1) and 45 C.F.R. § 3.6 which proscribes conduct that purposefully discriminate against Plaintiffs based on their race and national origin; intentional infliction of emotional distress upon Plaintiffs in violation of Pennsylvania's Constitution (42 Pa. Const. Stat. § 7102); Plaintiffs' right under 42 U.S.C. § 1981 to enter into the contractual agreement of marriage, to be afforded the same access as white persons to the local courthouse (a public place) in the district where MVCC is located in order to secure a marriage license, and not to have their rights impaired based on discriminatory practices; failure to properly train the personnel assigned to run and operate MVCC in matters concerning civil rights violation and violation of those rights protected by statute, Pennsylvania Constitution, and the United States Constitution---a duty that Geo is bound to abide by under the terms of its contractual agreement with the Federal Government; and creating a culture and/or practice within MVCC that engages in selective enforcement and

selective treatment of the alien-inmates housed at the facility and their families.  This violation caused Plaintiffs significant pain and suffering by depriving them of a fundamental right inherent in their liberty as individuals within the jurisdiction of the United States---that personal right essential to the orderly pursuit of happiness, by causing them emotional distress, and by causing them substantial prejudice.

67.  Defendant O'Neal, in his individual capacity and under color of law, both state and federal, violated Plaintiffs' right under Title VI of the Civil Rights Act not to be discriminated against based on their national origin; Plaintiffs' First and Fourteenth Amendment right to marry and not to have their right to marry encroached upon based on their race, national origin, or any other impermissible bases not authorized by law; Plaintiffs' constitutional right not to be subjected to discriminatory practices, policy or customs, of which was put into place at MVCC by Geo and Defendant O'Neal for the purpose of preventing Plaintiffs from claiming any statutory benefits that would otherwise be available to them; Plaintiffs' constitutional right to equal protection under law in that Plaintiffs have been deprived of their right to marry even though individuals in similar circumstances as Plaintiffs have had their right to marry protected; Plaintiffs' right under 42 U.S.C. § 1983 not to be deprived of a constitutionally protected right, not to be discriminated against, and not to be treated differently from other individuals similarly situated; conspiring with Geo to interfere with, and deprive Plaintiffs of, their civil rights, in violation of 42 U.S.C. § 1985; the directives set forth under 28 C.F.R. § 42.104(b)(2) and 45 C.F.R. § 3.6 which proscribes conduct that purposefully discriminate against Plaintiffs based on their race and national origin; intentional infliction of emotional distress upon Plaintiffs in violation of Pennsylvania's Constitution (42 Pa. Const. Stat. § 7102); Plaintiffs' right under 42 U.S.C. § 1981 to enter

into the contractual agreement of marriage, to be afforded the same access as
white persons to the local courthouse (a public place) in the district where
MVCC is located in order to secure a marriage license, and not to have their
rights impaired based on discriminatory practices; failure to properly train
DHS and Immigration and Customs Enforcement (ICE) personnel assigned to execute
immigration laws in the removal proceedings conducted at MVCC in matters
concerning civil rights violation and violation of those rights protected by
statute, Pennsylvania Constitution, and the United States Constitution---a duty
that Defendant O'Neal is bound to abide by under § 602 of the Civil Rights Act
of 1964; and creating a culture and/or practice within MVCC that engages in
selective enforcement and selective treatment of the alien-inmates housed at
the facility and their families.  This violation caused Plaintiffs significant
pain and suffering by depriving them of a fundamental right inherent in their
liberty as individuals within the jurisdiction of the United States---that
personal right essential to the orderly pursuit of happiness, by causing them
emotional distress, and by causing them substantial prejudice.

68.    Defendant Administrator, in his/her individual capacity and acting
under color of federal law, violated Plaintiffs' right under Title VI of the
Civil Rights Act not to be discriminated against based on their national origin;
Plaintiffs' First, Fifth, Tenth and Fourteenth Amendment right to marry and not
to have their right to marry encroached upon based on their race, national origin,
or any other impermissible bases not authorized by law; Plaintiffs' constitutional
right not to be subjected to discriminatory practices, policy or customs, of
which has been implemented at MVCC with the goal of preventing Plaintiffs from
claiming any statutory benefits that would otherwise be available to them;
Plaintiffs' constitutional right to equal protection under law in that Plaintiffs
have been deprived of their right to marry even though individuals in similar

circumstances as Plaintiffs have had their right to marry protected; Plaintiffs' guarantee under Bivens not to be deprived of a constitutionally protected right, not to be discriminated against, and not to be treated differently from other individuals similarly situated; the directives set forth under 28 C.F.R. § 42.104 (b)(2) and 45 C.F.R. § 3.6 which proscribes conduct that purposefully discriminate against Plaintiffs based on their race and national origin; Plaintiffs' right under 42 U.S.C. § 1981 to enter into the contractual arrangement of marriage, to be afforded the same access as white persons to the local courthouse (a public place) in the district where MVCC is located in order to secure a marriage license, and not to have their rights impaired based on discriminatory practices; failure to properly train the personnel assigned to run and operate MVCC in matters concerning civil rights violation and violation of those rights protected by federal law and the United States Constitution; and allowing a culture and/or practice within MVCC that engages in selective enforcement and selective treatment of the alien-inmates housed at the facility and their families.

69.   Mr. Davis appealed to Defendant Administrator to overturn Defendant Wigen's denial of his request to marry Ms. Beckford.  However, rather than Defendant Administrator properly addressing this crucial violation of a constitutionally protected right as s/he is required to do in his/her capacity as head of the BOP Privatization Management Branch, Defendant Administrator, in a written response to Mr. Davis, stated that Mr. Davis would have to return to Defendant Wigen with his grievance in order to obtain the resolution that he seeks, ignoring altogether the fact that Mr. Davis and Ms. Beckford suffered a constitutional deprivation of one of their most fundamental rights under the law.  This violation caused Plaintiffs significant pain and suffering by depriving them of a fundamental right inherent in their liberty as individuals within the jurisdiction of the United States---that personal right essential to the orderly

pursuit of happiness, by causing them emotional distress, and by causing them substantial prejudice.

70.    Plaintiffs incorporate by reference to paragraphs 66 and 67 of this complaint Defendants Geo and O'Neal violation of Plaintiffs' Fifth and Tenth Amendment right.

71.    As a proximate result of the Defendants' unconstitutional acts, omissions, policies and practices, Plaintiffs suffered, and are continuing to suffer, an unconstitutional deprivation of their guaranteed right and their liberty.

72.    Ms. Beckford has suffered through years of emotional and psychological distress in learning to cope with Mr. Davis' absence and how to accept the untenable justification given for his more than two decade absence.  For her to now be told that she will not be allowed to marry Mr. Davis without any proper or valid reason or justification has compounded the emotional distress that she has already gone through with a new and profound form of emotional and psychological distress that has inexorably led to depression and a sense of hopelessness.

## VIII.  PLAINTIFFS' CLAIM FOR RELIEF

73.    The Plaintiffs request a jury trial.

74.    The Plaintiffs further request damages against each of the following Defendants:

75.    Plaintiffs request separately compensatory damages against Defendant Geo in the amount of $4.5 million.  Plaintiffs further request separately punitive damages against this defendant in the amount of $4.5 million.

76.    Plaintiffs request separately compensatory damages against Defendant O'Neal in the amount of $750,000.  Plaintiffs further request separately punitive

damages against this defendant in the amount of $750,000.

77.   Plaintiffs request separately compensatory damages against Defendant Administrator in the amount of $750,000.  Plaintiffs further request separately punitive damages against this defendant in the amount of $750,000.

78.   Plaintiffs request separately compensatory damages against Defendant Wigen in the amount of $750,000.  Plaintiffs further request separately punitive damages against this defendant in the amount of $750,000.

## IX.  PLAINTIFFS' OTHER PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that the Court:

  i.   Issue a judgment declaring that Defendants' rationale, bases, policies, practices, acts, and omissions described herein for refusing to allow Plaintiffs to marry are unlawful and violate Plaintiffs' rights under the First, Fifth, Tenth and Fourteenth Amendment to the United States Constitution;

 ii.   Permanently enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiffs and others similarly situated to the constitutional and statutory violations, and unconstitutional interpretation and application of regulations, policies, acts and omissions, described herein;

iii.   Grant such other relief as this Court deems just and proper.


Dated: February 16, 2016.

Respectfully submitted,


Brian A. Davis, Plaintiff
Federal Register No. 40427-053
M.V.C.C.
555 Geo Drive
Philipsburg, PA 16866

Fredricka K. Beckford, Plaintiff
437 Peaks Landing, SE
Conyers, Georgia 30013
Phone: (347) 791-7919
Email: FBeckford1@gmail.com