## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRIAN A. DAVIS and FREDRICKA K.    )          Case No. 3:16-cv-26
BECKFORD,                          )
                                   )          JUDGE KIM R. GIBSON
          Plaintiffs,              )
                                   )
     v.                            )
                                   )
THE GEO GROUP, INC.; GEORGE C.     )
WIGEN, FORMER WARDEN,              )
MOSHANNON VALLEY                   )
CORRECTIONAL CENTER; DONNA         )
MELLENDICK, FORMER                 )
ADMINISTRATOR, BUREAU OF           )
PRISONS PRIVATIZATION              )
MANAGEMENT BRANCH; and             )
DAVID O'NEILL, ASSISTANT FIELD     )
DIRECTOR, DEPARTMENT OF            )
HOMELAND SECURITY,                 )
                                   )
          Defendants.              )

## MEMORANDUM OPINION

Before the Court is Defendants David O'Neill ("O'Neill") and Donna Mellendick's ("Mellendick") Motion to Dismiss Plaintiffs' Second Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (ECF No. 86), and Defendants Geo Group, Inc. ("GEO") and G.C. Wigen's ("Wigen") Motion to Dismiss Plaintiffs' Second Amended Complaint. (ECF No. 89.) Plaintiffs Brian A. Davis ("Davis") and Fredricka K. Beckford's ("Beckford") Second Amended Complaint includes the following five claims against all Defendants: Conspiracy to Interfere with Civil Rights under 42 U.S.C. § 1985(3) (Count I); Violation of the Religious Freedom Restoration Act ("RFRA") (Count II);

Intentional Infliction of Emotional Distress ("IIED") (Count III); Violation of Civil Rights under 42 U.S.C. § 1983 (Count IV); and Creation of Unconstitutional Conditions of Confinement under 42 U.S.C. § 1983 (Count V). (ECF No. 62.) Beckford seeks damages from Wigen in his individual capacity with respect to her IIED claim. (*Id.* at 17–18.) However, Davis and Beckford do not state that they are suing any of the Defendants in their individual capacities with respect to any of their other claims. (*See* ECF No. 62.)

O'Neill and Mellendick contend that this Court does not have subject matter jurisdiction over Beckford's IIED claim against them (Count III) under the Federal Employees Liability Reform and Tort Compensation Act ("Liability Reform Act"). (ECF No. 87 at 9.) With respect to Counts I, II, IV, and V, O'Neill and Mellendick argue that they are entitled to qualified immunity and that Davis and Beckford have failed to state claims upon which relief can be granted. (*Id.* at 18–30.) Further, O'Neill and Mellendick contend that all claims against Mellendick are barred by the statute of limitations. (*Id.* at 30–34.) Finally, they argue that Davis is not entitled to compensatory damages on any of the five counts. (*Id.* at 34–35.)[1] For their part, GEO and Wigen state that, with respect to all counts, Davis and Beckford have failed to allege an adequate factual basis upon which relief can be granted. (*See* ECF No. 90.)

---

[1] As the Court explains more fully below, it is granting O'Neill and Mellendick's motion to dismiss for lack of subject matter jurisdiction. It is also granting Defendants' motions to dismiss for failure to state a claim because, for all five of their claims, Davis and Beckford have failed to allege sufficient facts upon which relief can be granted. Therefore, the Court will not consider the issues of qualified immunity, whether the claims against Mellendick are barred by the statute of limitations, and whether Davis is entitled to compensatory damages.

The Defendants' Motions are full briefed (ECF Nos. 87, 90, 96, 101, 102, 105), and are ripe for disposition. For the following reasons, the Court **GRANTS** O'Neill and Mellendick's Motion to Dismiss Plaintiffs' Second Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (ECF No. 86), and also **GRANTS** GEO and Davis' Motion to Dismiss Plaintiffs' Second Amended Complaint. (ECF No. 89.)

## I.     Jurisdiction and Venue

This Court has subject-matter jurisdiction over Davis and Beckford's constitutional and statutory claims because they arise under federal law.  28 U.S.C. §§ 1331, 1343.  This Court has subject-matter jurisdiction over Beckford's remaining state law claim because it forms part of the same case or controversy as the federal claims.  28 U.S.C. § 1367.

Venue is proper in this district because a substantial portion of the events or omissions giving rise to the claims occurred in the Western District of Pennsylvania.  28 U.S.C. § 1391(b)(2).

## II.     Factual Background[2]

This case arises from Davis and Beckford's unsuccessful efforts to get married while Davis was an inmate at Moshannon Valley Correctional Center ("MVCC").  (*See* ECF No. 62.)

---

[2] Unless otherwise noted, the Court draws the following facts, which it accepts as true for purposes of deciding the motions, from Davis and Beckford's Second Amended Complaint. (ECF No. 62.) Because the Amended Complaint omits some basic facts that were previously included in the Complaint and First Amended Complaint and that are helpful for providing context and a coherent factual narrative, the Court also draws certain facts from the Complaint and First Amended Complaint. (ECF Nos. 3, 6.)

Mr. Davis is a black Jamaican national who resided in the United States from an early age. (*Id.* at 4.) Ms. Beckford is a black United States citizen of Jamaican descent who resided in the State of Georgia during the timeframe relevant to this case. (*Id.* at 3.) Beckford met Davis as a child, and the pair had a continuous relationship over the following years. (*Id.*)

In 1993, Davis was convicted of non-violent drug offenses and sentenced to life imprisonment. (*Id.* at 5.) Following his sentencing, Davis was incarcerated at FCI McKean in Bradford, Pennsylvania, where he remained until his term of imprisonment was reduced to thirty years on June 19, 2008. (*Id.*) Once his sentence was reduced, Davis and Beckford became engaged and planned to get married. (*Id.*) As devout Christians, Davis and Beckford viewed getting married as an expression of their faith. (*Id.* at 16.) Following the reduction of his sentence, Davis also requested to be transferred to FCI Fort Dix, a BOP-operated facility in New Jersey that was close to his family, who lived in New York. (*Id.* at 7.) Davis was instead transferred to MVCC, where he arrived on June 1, 2012. (*Id.*) At the time of Davis's arrival at MVCC, he and Beckford knew that he would soon face deportation. (*Id.* at 5.)

MVCC was a private prison owned by GEO and located in Philipsburg, Pennsylvania. (ECF No. 3 at 4.) GEO was a private corporation with headquarters in Florida. (ECF No. 62 at 6.) GEO owned and operated MVCC pursuant to a contract with the United States and under the supervision of the Bureau of Prisons ("BOP"). (*Id.*)

After Davis arrived at MVCC, he and Beckford submitted a written request to MVCC administrative staff, asking that preparations be made to allow the couple to get

4

married. (*Id.* at 7.) Davis and Beckford indicate that MVCC administrative personnel denied Davis's request on multiple occasions, and that the last denial came from Wigen, the warden at MVCC from around March of 2013 to November of 2015. (*Id.*; ECF No. 3 at 4.) Beckford also submitted a written request to MVCC personnel asking that preparations be made for her and Davis to marry, but her request was denied as well. (ECF No. 62 at 8.)

After MVCC denied their request to marry, Davis and Beckford challenged the denial through the administrative remedy process, and ultimately brought the matter to the attention of the Administrator of the Privatization Management Branch at the BOP, Mellendick. (*Id.*) In response, Mellendick or a member of her staff informed Davis, in a written correspondence, that the matter was exclusively for MVCC personnel to resolve. (*Id.*)

Davis remained at MVCC until on or around April 20, 2016. (*Id.* at 9.) He and Beckford were not permitted to marry at any point prior to his departure from MVCC. (*Id.*) As a result of her inability to marry Davis, Beckford states that she has suffered "stress, anxiety, hospitalization, and long term medical issues." (*Id.* at 19.)

Davis and Beckford allege that the BOP and other government officials have contracted with GEO to ensure that alien-inmates are housed at MVCC and prevented from marrying. (*Id.* at 10.) Specifically, they allege that Mellendick, in her capacity as administrator of the BOP Privatization Branch, and O'Neill, who was the Assistant Field Officer Director of the Philadelphia Field Office of Immigration and Customs Enforcement ("ICE"), Department of Homeland Security ("DHS") at the time, were the individuals "who directed MVCC to deny inmates the right to marry." (*Id.*) According to Davis and Beckford,

approximately "98% (if not all) of the inmates housed at MVCC are faced with an impending immigration matter or have been ordered deported from the United States," and DHS "is able to commence removal proceedings while the inmate is serving their federal sentence." (*Id.*) Davis and Beckford state that since MVCC was acquired by GEO and began receiving federal funding, no inmates at the prison have been allowed to marry. (*Id.* at 9–10.)

### III.      Procedural Background

Davis and Beckford filed a *pro se* Complaint on January 25, 2016, and then filed an Amended Complaint on February 22, 2016. (ECF Nos. 1, 6.) In their Amended Complaint, Davis and Beckford brought claims against GEO, Wigen, O'Neill, and the then-unnamed Administrator of the Bureau of Prisons Privatization Management Branch. (ECF No. 6.) Davis and Beckford alleged that the Defendants had violated: Title VI of the Civil Rights Act, 42 U.S.C. § 2000d; 42 U.S.C. §§ 1981, 1983, 1985; the Equal Protection Clause of the U.S. Constitution; the Constitution of Pennsylvania; 45 C.F.R. § 3.6; and 28 C.F.R. § 42.104.

On August 31, 2017, GEO and Wigen filed a Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rule 12(b)(6). (ECF No. 29.) On December 15, 2017, the Magistrate Judge issued a Report and Recommendation, recommending that this Court grant GEO and Wigen's motion to dismiss. (ECF No. 37.) The Magistrate Judge found that Davis and Beckford had failed to state claims against GEO and Wigens upon which relief could be granted. (*Id.*) Further, the Judge found that Davis and Beckford's failure to prosecute the case against the BOP Administrator and O'Neill mandated dismissal of the claims against those defendants. (*Id.*) On January 30, 2018, this Court adopted the Magistrate Judge's

Report and Recommendation as the opinion of the Court. (ECF No. 44.) In response, on January 31, Davis and Beckford appealed this Court's decision to the Third Circuit. (ECF No. 45.)

In its opinion, the Third Circuit affirmed this Court's dismissal of Plaintiffs' *Bivens* claim, as well as Plaintiffs' claims under 42 U.S.C. §§ 1981, 1983, 2000d. *Davis v. Samuels*, 962 F.3d 105, 113–16 (3d Cir. 2020). However, the Third Circuit reversed this Court's dismissal of Davis and Beckford's claim under 42 U.S.C. § 1985(3), as well as its dismissal of Davis and Beckford's claims under the Equal Protection Clause, Pennsylvania Constitution, and Federal regulations. *Id.* at 115–16. With respect to Davis and Beckford's claim under Section 1985(3), the Third Circuit reversed this Court on narrow grounds, explaining that it was "not opining on the merit" of Plaintiffs' Section 1985(3) claim. *Id.* at 114. It was only saying that the "rationale given for the order of dismissal presently before [it] was wrong." *Id.* Finally, the Third Circuit vacated this Court's dismissal of the claims against the Federal Defendants (the unnamed BOP Administrator, O'Neill, and others), and remanded the case to this Court. *Id.* at 116–17.

On September 1, 2020, Davis and Beckford submitted their Second Amended Complaint, this time expressly naming Mellendick as the Former Administrator of the Bureau of Prisons, Privatization Management Branch. (ECF No. 62.) As noted earlier, Davis and Beckford's Second Amended Complaint alleges the following five claims: Conspiracy to Interfere with Civil Rights under 42 U.S.C. § 1985(3) (Count I); Violation of the Religious Freedom Restoration Act ("RFRA") (Count II); Intentional Infliction of Emotional Distress

(Count III); Violation of Civil Rights under 42 U.S.C. § 1983 (Count IV); and Creation of Unconstitutional Conditions of Confinement under 42 U.S.C. § 1983 (Count V). (*Id.*)

On February 5, 2021, O'Neill and Mellendick filed a motion to dismiss Davis and Beckford's Second Amended Complaint for lack of subject matter jurisdiction and failure to state a claim. (*See* ECF No. 86.) On the same day, GEO and Wigens filed a motion to dismiss the Second Amended Complaint for failure to state a claim. (*See* ECF No. 89.)

## IV.     Legal Standard

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the "court's 'very power to hear the case.'" *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. And Loan Ass'n,* 549 F.2d 883, 891 (3d Cir. 1977)). The party asserting that federal jurisdiction exists in a matter bears the burden of proving the existence of such subject matter jurisdiction. *See Brown v. Tucci,* 960 F. Supp. 2d 544, 561 (W.D. Pa. 2013) (citing *Dev. Fin. Corp. v. Alpha Housing & Health Care,* 54 F.3d 156, 158 (3d Cir. 1995)). There is a crucial difference between a Rule 12(b)(1) motion that attacks a complaint on its face, and a Rule 12(b)(1) motion that attacks the existence of subject matter jurisdiction in fact—apart from any pleadings. *See Mortensen,* 594 F.2d at 891. With a facial attack, a court must consider the allegations of a complaint as true, as with a motion filed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See id.* With a factual attack, however, the court ordinarily is not required to limit its inquiry to the facts as they are pled in the complaint because a presumption of truth is not attached to the plaintiff's allegations, and the plaintiff bears the

burden of proving that jurisdiction over the subject matter at issue exists. *See id.; see also* *Tucci,* 960 F. Supp. 2d at 561 (citing *Dev. Fin. Corp.,* 54 F.3d at 158).

### B. Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted

The Court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) where the complaint fails "to state a claim upon which relief can be granted." *Connelly v. Lane Const. Corp.,* 809 F.3d 780, 786 (3d Cir. 2016). However, detailed pleading is not generally required. *Id.* The Federal Rules of Civil Procedure demand only "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of what the claims are and the grounds upon which they rest. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.[3] *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Id.* Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then

---

[3] Although *Iqbal* described the process as a "two-pronged approach," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), the Supreme Court noted the elements of the pertinent claim before proceeding with that approach, *see id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly*, 809 F.3d at 787; *Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010)).

determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Connelly*, 809 F.3d at 786. Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## V.     Discussion: Motion to Dismiss for Lack of Subject Matter Jurisdiction

### A.  The Parties' Arguments

O'Neill and Mellendick contend that because they were acting within the scope of their employment when they took the actions that form the basis of Beckford's IIED claim, Beckford must advance that claim against the United States. (ECF No. 87 at 8.) Further, O'Neill and Mellendick argue that Beckford failed to file an administrative tort claim against the United States, meaning that she has not exhausted her administrative remedies and cannot bring a claim against the United States before this Court. (*Id.* at 9.) Finally, O'Neill and Mellendick argue that because Beckford is alleging an intentional tort, she cannot bring a claim against the United States under the Federal Tort Claims Act ("FTCA"). (*Id.*)[4]

Plaintiffs do not express any disagreement with the suggestion that O'Neill and Mellendick were acting within the scope of their employment when they took the actions

---

[4] As the Court explains more fully below, it concludes that Beckford cannot bring her IIED claim against the United States because she failed to exhaust her administrative remedies. Therefore, the Court will not address O'Neill and Mellendick's contention that Beckford cannot bring her IIED claim against the United States because she seeks recovery for an intentional tort.

that form the basis of Beckford's IIED claim, or that the United States is the proper defendant for that claim. (*See* ECF Nos. 96 and 105.) However, Plaintiffs do contend that O'Neill and Mellendick should not be allowed to rely on certain documents that they attached to their brief in establishing that Beckford has not exhausted her administrative remedies. (ECF No. 96 at 4.)

### B. The Liability Reform Act

The Liability Reform Act "provides federal employees acting within the scope of their employment absolute immunity from damage liability on state law tort claims." *Brumfield v. Sanders*, 232 F.3d 376, 379 (3d Cir. 2000). Under the Liability Reform Act, the Attorney General may certify that federal employees who are defendants in a lawsuit were acting within the scope of their employment with respect to the conduct at issue and request that the United States be substituted as the only defendant in place of those employees. *Id.*[5] The Attorney General has delegated the authority to certify that federal employees were acting within the scope of their employment to United States Attorneys in consultation with the Department of Justice. *Bohnenkamp v. Whisterbarth*, No. 1:19-cv-00115-RAL, 2021 WL 1600477, at *5 (W.D. Pa. Apr. 23, 2021).When the United States Attorney for the district in which a court sits files papers on behalf of defendants indicating that those defendants were acting within the scope of their employment, the

---

[5] 28 U.S.C. § 2679(d)(1) provides that upon "certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."

Court may accept those papers as the US Attorney's certification. *Maclean v. Secor*, 876 F. Supp. 695, 705 (E.D. Pa. 1995).

A United States Attorney's certification is *prima facie* evidence that the employee's challenged conduct occurred within the scope of employment, but it is not conclusive. *Schrob v. Catterson*, 967 F.2d 929, 936 (3d Cir. 1992). Thus, a plaintiff challenging the certification has the burden of coming forward with specific facts rebutting it. *Id.* Ultimately, the scope of employment determination under the Liability Reform Act is governed by "'the law of the place where the act or omission occurred.'" *Maclean*, 876 F. Supp. at 705 (quoting 28 U.S.C. § 1346(b)); *see also Melo v. Hafer*, 912 F.2d 628, 642 (3d Cir. 1990). Therefore, Pennsylvania law governs the scope of employment issue in this case.[6] In determining whether an employee was acting within the scope of his or her employment, Pennsylvania courts look to the Restatement (Second) of Agency, which provides that conduct "'is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time

---

[6] Mellendick's office was in Washington, D.C. (ECF No. 6 at 5–6.) Further, Plaintiffs allege that either Mellendick or a member of her staff informed Davis that she would leave the issue of Davis and Beckford getting married to MVCC. (ECF No, 62 at 8.) Thus, the Court could infer that Mellendick acted relative to Davis's request from Washington, D.C. However, O'Neill's office was in Philadelphia. (*Id.* at 6.) Accordingly, the Court finds that where one federal employee may have acted from Washington, D.C., another almost certainly acted from within Pennsylvania. Further, Plaintiffs allege that Mellendick and O'Neill worked with GEO and Wigen to prevent the inmates at MVCC from marrying. (*Id.* at 11.) It is a fair inference that a good portion of this activity occurred in Pennsylvania, where O'Neill's office and MVCC were located. Therefore, because many of the events underlying Beckford's IIED claim—i.e., "the denial of her and Mr. Davis's multiple requests to MVCC and the United States government to marry," (*Id.* at 18)—appear to have occurred in Pennsylvania, the Court holds that Pennsylvania law applies to the scope of employment issue.

and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master.'"

*Sanders,* 232 F.3d at 380 (quoting Restatement (Second) Agency § 228).

### C. O'Neill and Mellendick Were Acting Within the Scope of Their Employment

For several reasons, the Court finds that O'Neill and Mellendick were acting within the scope of their employment when they took the actions that form the basis for Beckford's IIED claim. First, the United States Attorney for the Western District of Pennsylvania filed the papers for O'Neill and Mellendick in this case, contending that they were acting within the scope of their employment when they took the actions that form the basis for Beckford's IIED claim. (ECF No. 87 at 9, 35.) The Court accepts this as the U.S. Attorney's certification that O'Neill and Beckford were acting within the scope of their employment. Second, Plaintiffs, who bear the burden of coming forward with specific facts rebutting the U.S. Attorney's certification, do not dispute that O'Neill and Mellendick were acting within the scope of their employment.

Finally, Plaintiffs' Second Amended Complaint alleges that O'Neill and Mellendick "actively participated in the denial of Plaintiffs' right to marry by explicitly denying the couple the ability to marry and/or by delegating the authority to determine whether Plaintiffs' [sic] could exercise their constitutional rights to GEO Group, a privately owned entity." (ECF No. 62 at 11.) O'Neill could have only taken these actions as part of his work for ICE, and Mellendick could have only taken these actions as part of her work for the BOP's Privatization Management Branch. If they had attempted to take these actions in their personal capacities, they would have had neither the ability to

influence Plaintiffs' requests to marry nor any authority to delegate to GEO. Therefore, the Court is satisfied that O'Neill and Mellendick's actions were: (1) of the kind they were employed to perform, (2) taken within the authorized time and space limits, and (3) actuated by a purpose to serve the master. *Sanders,* 232 F.3d at 380 (quoting Restatement (Second) Agency § 228).

Accordingly, the Court holds that O'Neill and Mellendick were acting within the scope of their employment when they took the actions underlying Beckford's IIED claim. Thus, the Court will substitute the United States for O'Neill and Mellendick with respect to Count III. 28 U.S.C. § 2679(d)(1).

Having determined that the United States is the proper defendant for Beckford's IIED claim, the Court will now turn to whether it has jurisdiction over Beckford's claim against the United States.

### D.  Beckford Has Failed to Exhaust Her Administrative Remedies

The Liability Reform Act requires, "as a prerequisite to filing suit, presentation of an administrative tort claim to the appropriate administrative agency within two years." *Bansal v. Russ*, 513 F. Supp. 2d 264, 285 (E.D. Pa. 2007) (citing 28 U.S.C. § 2675(a)). This requirement is a jurisdictional one—where "no such claim has been filed within two years, the court lacks subject matter jurisdiction." *Id.* (citing *Bialowas v. United States,* 443 F.2d 1047, 1049 (3d Cir. 1971)); *see also Perotti v. United States,* 664 F. App'x 141, 143 (3d Cir. 2016) (holding that where the plaintiff did not submit an administrative tort claim prior to filing his complaint, he failed to exhaust his administrative remedies, and the district court lacked subject matter jurisdiction over his claim).

As the Court noted above, with respect to a factual Rule 12(b)(1) motion, which O'Neill and Mellendick have advanced here, the plaintiff has the burden of proving that jurisdiction exists. *Mortensen,* 549 F.2d at 891. Here, Beckford has not alleged that she submitted an administrative tort claim. Further, she and Davis have not responded to O'Neill and Mellendick's assertion that they have failed to exhaust their administrative remedies, except to contend that this Court should not consider documents that O'Neill and Mellendick attached to a brief. Therefore, the Court holds that Beckford failed to exhaust her administrative remedies, and the Court does not have subject matter jurisdiction over Beckford's IIED claim against the United States.

Finally, because approximately five years have passed since Davis was released from MVCC, and because Beckford has taken no action to alert this Court that she did in fact exhaust her administrative remedies at any time during those five years, the Court finds that granting her leave to amend would be futile. Therefore, the Court will dismiss Beckford's IIED claim against the United States with prejudice. *Maclean,* 876 F. Supp. at 706.

## VI.   Discussion: Motion to Dismiss for Failure to State a Claim

### A.   Count One: Plaintiffs' Section 1985(3) Claim

#### 1.   The Parties' Arguments

With respect to Plaintiffs' claim under Section 1985(3), O'Neill and Mellendick argue that (1) they are entitled to qualified immunity, (2) the Plaintiffs have failed to plead a conspiracy with particularity, and (3) it is not clear that Plaintiffs are part of a class protected by Section 1985. (ECF No. 87 at 18–26.) In like fashion, GEO and Wigen argue

that the Plaintiffs have failed to adequately allege the existence of a conspiracy, and have failed to allege facts indicating that the Defendants took any adverse action toward Plaintiffs on the basis of Plaintiffs' membership in a class protected by Section 1985. (ECF No. 90 at 4–12.)

In response, Davis and Beckford contend that they have alleged sufficient facts showing the existence of a conspiracy. (ECF No. 96 at 5–7.)  For example, Plaintiffs point to Mellendick rejecting Davis's request to review MVCC's denial of his application to marry Beckford. (*Id.* at 7.) Further, Plaintiffs argue that the Supreme Court has established that classifications based on alienage, nationality, or race are subject to close judicial scrutiny. (*Id.* at 11–12.) Therefore, because the Defendants denied Davis and Beckford the right to marry based on Mr. Davis's status as an alien, the Defendants have violated Section 1985. (*Id.* at 13.)

### 2. The Requirements of Section 1985(3)

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). In order to state a claim under § 1985(3), a:

> [P]laintiff must allege … "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."

*Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983)).

16

Although Section 1985(3) applies to private conspiracies, it was "not intended to provide a federal remedy for 'all tortious conspiratorial interferences with the rights of others,' or to be a 'general federal tort law.'" *Id.* at 135 (*Griffin v. Breckenridge,* 403 U.S. 88, 101–02 (1971)). Indeed, the Supreme Court has held that because Section 1985(3) "requires the 'intent to deprive of *equal* protection, or *equal* privileges and immunities,' a claimant must allege 'some racial, *or perhaps otherwise class-based*, invidiously discriminatory animus behind the conspirators' action' in order to state a claim. *Id.* (quoting *Griffin,* 403 U.S. at 102.) Given this direction from the Supreme Court, the Third Circuit has explained that there are two aspects to the "class-based invidiously discriminatory animus" necessary to support a Section 1985(3) claim—the "first is defined by form, and the second by function." *Id.* A plaintiff must allege both that (1) the conspiracy was motivated by discriminatory animus against an identifiable class and (2) that the discrimination against that identifiable class was invidious. *Id.*

With respect to Section 1985(3)'s first requirement, that the conspiracy be motivated by discriminatory animus against an identifiable class, the Supreme Court has noted that the word "class" connotes:

> [S]omething more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity that the defendant has interfered with.

*Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 269 (1993). Accordingly, Section 1985(3) "defendants must have allegedly conspired against a group that has an identifiable existence independent of the fact that its members are victims of the

defendants' tortious conduct." *Farber*, 440 F.3d at 136. For example, women or registered Republicans might be identifiable classes under Section 1985(3), but women seeking an abortion or persons who support political candidates are not identifiable groups. *Id.*

Finally, with respect to Section 1985(3)'s second requirement, that the discrimination against the identifiable class must be invidious, the Supreme Court has indicated, but not expressly held, that Section 1985(3) was only intended to reach "class-based animus" against African-Americans and those who championed their cause. *United Broth. Of Carpenters & Joiners of America*, 462 U.S. at 836. For its part, the Third Circuit has emphasized the "'irrational and odious' nature of discrimination motivated by a class's immutable characteristics" because such characteristics are determined by birth and bear no relation to one's ability to perform or contribute to society. *Farber*, 440 F.3d at 142. On that basis, the Third Circuit has held that discrimination based on gender and mental handicap are protected classes under Section 1985(3). *Id.* However, the Third Circuit has declined to expressly hold that discrimination motivated by a mutable characteristic can never be invidious. *Id.* (holding, however, that discrimination based on political affiliation does not qualify for protection under Section 1985(3)).

### 3. Davis and Beckford Have Not Alleged that Defendants Conspired Against Them Based on Their Membership in an Identifiable Class

Here, Davis and Beckford contend that the Defendants conspired to prohibit them from marrying on the basis of their race, national origin, or Davis's status as a non-citizen alien. (ECF No. 62 at 11.)

Turning first to Davis and Beckford's claim that Defendants conspired against them because they are both Black (*Id.* at 3–4), as noted earlier, the victim of a conspiracy motivated by racial discrimination may bring a Section 1985(3) claim. *Farber*, 440 F.3d at 138. However, Davis and Beckford have not sufficiently alleged a conspiracy motivated by racial discrimination because they state that the Defendants established a "practice and custom of prohibiting all inmate marriage" at MVCC (ECF No. 62 at 2), but they do not allege that all inmates at MVCC were of the same race. *See Davis*, 962 F.3d at 115–16 (holding that Davis and Beckford could not plausibly state a claim for racial discrimination because they alleged that all inmates at MVCC, regardless of race, were deprived of the right to marry). In other words, because Davis and Beckford have alleged that the Defendants denied everyone at MVCC the right to marry, regardless of race, they have not plausibly alleged that the Defendants took any negative action toward them on the basis of their race. For purposes of this claim, Davis and Beckford's "class" is best defined as a group of individuals who desired to engage in conduct (marriage) that the Section 1985(3) Defendants disfavored. Accordingly, the Court holds that Davis and Beckford cannot sustain a claim for a Section 1985(3) conspiracy to deny them their right to marry based on their race.

Turning next to Davis and Beckford's claim that Defendants conspired against them because they are Jamaican (ECF No. 62 at 3–4), and assuming without deciding that discrimination based on national origin is actionable under Section 1985(3), Davis and Beckford's allegations are insufficient for the same reasons as their allegations related to race. They have not alleged discrimination based on national origin because they contend

19

that the Defendants denied all inmates at MVCC the right to marry, but they do not allege that all inmates at MVCC were Jamaican. *See Davis,* 962 F.3d at 116 (holding that Davis and Beckford could not plausibly state a claim for discrimination based on national origin where they alleged that all inmates at MVCC, regardless of national origin, were denied the right to marry). Thus, the Court holds that Davis and Beckford cannot sustain a claim for a Section 1985(3) conspiracy to deny them their right to marry based on their national origin.

Turning lastly to Davis and Beckford's claim that Defendants conspired against them because Davis is a non-citizen alien (ECF No. 62 at 11), the Court finds that this allegation is also insufficient to state a claim under Section 1985(3).

Davis and Beckford allege that from the time GEO acquired MVCC and began receiving federal funding, no inmate at the prison has been allowed to marry. (*Id.* at 9.) Further, they state that "[r]oughly 98% (if not all) of the inmates housed at MVCC are faced with an impending immigration matter or have been ordered deported from the United States." (*Id.* at 10.) While these allegations get Davis and Beckford closer to plausibly stating a claim for a conspiracy to discriminate based on alien status than do their allegations related to race and national origin, they still fall short for two reasons. First, Davis and Beckford contend that since GEO acquired MVCC and began receiving federal funding, no inmate has been allowed to marry, but they do not allege that 98% of inmates at MVCC were non-citizen aliens *going back in time to the date when GEO group first acquired MVCC*. Moreover, "roughly" 98 % of inmates is not 100% of inmates—Davis and Beckford's Second Amended Complaint leaves open the possibility that Defendants

barred non-citizen inmates and some percentage of citizen inmates alike from marrying.

Both of these factual allegations lead this Court to conclude that Davis and Beckford have

not plausibly stated that the Defendants conspired against them because of their

membership in a class of non-citizen aliens. Once again, their "class" for purposes of this

claim is best described as an amorphous group of individuals, housed at MVCC, who

wanted to engage in conduct (marriage) that the Section 1985(3) Defendants disfavored.[7]

In short, the Court holds that Davis and Beckford have not plausibly alleged that

any conspiracy that did arise among Defendants was motivated by discriminatory animus

against an identifiable class. Therefore, the Court will dismiss Davis and Beckford's

Section 1985(3) claim.

---

[7] Even if Davis and Beckford had alleged that all inmates at MVCC were lawfully admitted non-citizen aliens from the time that GEO acquired the prison, the Court would still dismiss Plaintiffs' Section 1985(3) claim on the ground that alienage status is not a protected class under Section 1985(3). While the Third Circuit has not expressly held that discrimination based on a mutable characteristic can never be invidious, the immutability of a class's characteristics is the touchstone of its determination of whether a class is protected by Section 1985(3). *Farber*, 440 F.3d at 142. Unlike the classes that the Third Circuit has held can advance a claim under Section 1985(3) because they are defined by immutable characteristics (African Americans, women, and those with mental handicaps), *id.*, non-citizen alien individuals can, generally speaking, change their alienage status through naturalization if they follow the legally-prescribed process. *See, e.g., Kungys v. U.S.,* 485 U.S. 759, 764 (1988) (noting how an individual from Germany came to the United States on a visa and then was naturalized as a citizen). Therefore, because alienage status is mutable, the Court finds that discrimination based on that status is not sufficiently invidious to warrant the protection of Section 1985(3). *See also, McCleester v. Mackel,* No. 06-120J, 2008 WL 821531 at *28 (W.D. Pa. Mar. 27, 2008) (noting that the "Court cannot place singular reliance on the Supreme Court's Equal Protection Clause jurisprudence in determining whether a given class is entitled to protection under § 1985(3).").

**B.  Count Two: Plaintiffs' RFRA Claim**

**1.   The Parties' Arguments**

With respect to Plaintiffs' claim under RFRA, O'Neill and Mellendick again argue that they are entitled to qualified immunity. (ECF No. 87 at 18–22.) Further, O'Neill and Mellendick argue that Plaintiffs have failed to demonstrate that they were personally involved in any substantial burden that was placed on Plaintiffs' exercise of their faith. (*Id.* at 26–28.) For their part, GEO and Wigen contend that they were not federal actors, and so the requirements of RFRA did not govern their conduct. (ECF No. 90 at 12.) Finally, even if they were subject to RFRA, GEO and Wigen state that their actions did not substantially burden Plaintiffs' exercise of their faith. (*Id.* at 14.)

In response, Davis and Beckford argue that GEO and Wigen were federal actors subject to RFRA, and that the Third Circuit's decision in *Davis* supports their position. (ECF No. 96 at 16.) Further, Plaintiffs contend that Defendants did substantially burden the exercise of their faith because they not only limited their ability to get married, but they prevented them from doing so altogether. (*Id.* at 18–19.) Finally, Davis and Beckford contend that both O'Neill and Mellendick were personally involved in violating their right to exercise their faith. (*Id.* at 20–21.) For example, Mellendick was aware of the deprivation of Plaintiffs' rights and still refused to do anything about MVCC's denial of Plaintiffs' right to marry. (*Id.* at 20.)

## 2.  GEO and Wigen's Actions Were Governed by RFRA

RFRA prohibits the Government from:

> "[S]ubstantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the "Government" can "demonstrate[] that application of the burden to the person—(1) is in furtherance of a compelling interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

*Mack v. Warden Loretto FCI*, 839 F.3d 286, 301 (3d Cir. 2016) (quoting 42 U.S.C. § 2000bb-1).

RFRA defines "government" as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2.

Turning first to whether GEO and Wigen were government actors that were subject to RFRA, the Court notes that GEO obtained its authority to operate MVCC pursuant to a contract with the United States, and it was supervised by the BOP in operating the prison. (ECF No. 62 at 6.) The fact that GEO and Wigen, as the warden of MVCC, derived their authority over the prisoners under their charge from the United States strongly indicates that GEO was an instrumentality and Wigen an official of the United States. 42 U.S.C. § 2000bb-2. This notion is bolstered by the fact that the Third Circuit has already all but held that GEO and Wigen were federal actors, at least for purposes of analyzing Plaintiffs' *Bivens* claim. *Davis*, 962 F.3d at 112 (noting that the GEO Defendants operated private prisons on behalf of the federal government and that "[t]he performance of that function certainly appears to be the exercise of a right having its source in federal authority."). Therefore, the Court holds that GEO and Wigens were government actors subject to RFRA.

23

Having determined that GEO and Wigen constitute the "government" for purposes of RFRA, the Court now turns to whether Plaintiffs have alleged a prima facie violation of that statute by all Defendants.

### 3.   Davis and Beckford Have Not Alleged That Defendants Substantially Burdened the Exercise of Their Religion

To establish a prima facie case under RFRA, Davis and Beckford must allege that the government (1) substantially burdened (2) a sincere (3) religious exercise. *Mack,* 839 F.3d at 304. Here, Defendants do not dispute that Davis and Beckford getting married would have constituted a sincere exercise of their faith. (ECF No. 87 at 26–28; ECF No. 90 at 14–15.) Accordingly, the Court must determine whether Defendants' actions substantially burdened Davis and Beckford's ability to exercise their Christian faith.

The Third Circuit has explained that a "substantial burden exists where (1) 'a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit;'" or (2) "'the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.'" *Mack,* 839 F.3d at 304 (quoting *Washington v. Klem,* 497 F.3d 272, 280 (3d Cir. 2007)).

Plaintiffs' allegation that Defendants substantially burdened the exercise of their faith boils down to their statement that they are "devout Christians" who "viewed their marriage as an expression of that faith." (ECF No. 62 at 16.) Plaintiffs argue that

Defendants' denial of their right to marry therefore constitutes a substantial burden under the second prong of the Third Circuit's test. (ECF No. 96 at 18.)

Like Defendants, this Court does not doubt that Davis and Beckford sincerely wanted to marry, and sincerely viewed their marriage as an expression of their faith. However, the statement that they wanted to express their faith through marriage does not rise to the level of a substantial burden because they have not alleged that the Defendants put pressure on them to "substantially modify [their] behavior and to *violate [their] beliefs*." Indeed, by way of example, Davis and Beckford do not allege that Defendants compelled them to stop engaging in religious conduct that their faith prescribed. *See Mack,* 839 F.3d at 304 (finding that an inmate sufficiently alleged a substantial burden at the motion to dismiss stage where prison officials may have influenced him to stop praying at work, an action that could have been deemed a "betrayal" of his religious beliefs); *Klem,* 497 F.3d at 281–82 (finding a substantial burden where a prison prevented an inmate from reading the daily number of books that his faith required). Nor do they allege that Defendants put them to the choice of either engaging in conduct that their faith prohibits or paying a heavy price. *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 720 (2014) (holding that a burden was clearly substantial where the government compelled an entity to either provide health insurance that covered certain methods of birth control, an activity that "seriously violat[ed] [the company's] religious beliefs," or pay a tax of approximately $475 million per year).

Because Davis and Beckford have not alleged that Defendants pressured them into substantially modifying their behavior and violating their beliefs, the Court holds that

they have not alleged a substantial burden on their religious exercise. Accordingly, the Court will dismiss Davis and Beckford's RFRA claim.

### C. Count Three: Beckford's IIED Claim

#### 1. The Parties' Arguments

Turning to Beckford's IIED claim, because the Court has determined that the United States is the proper defendant for that claim, and because the Court has determined that it does not have subject matter jurisdiction over Beckford's claim against the United States, *see supra* Section V, the Court will confine its analysis to Beckford's IIED claim against GEO and Wigen.

GEO and Wigen contend that Beckford has not adequately alleged a claim for IIED because she has not stated that she has been diagnosed with severe emotional distress, which is necessary to sustain a claim for IIED under Pennsylvania state law. (ECF No. 90 at 15.) Further, they argue that Beckford has not alleged facts that would constitute "outrageous" or "extreme" actions on the part of GEO or Wigen. (*Id.* at 15–16.)

In response, Beckford argues that because she resided in Georgia at all times relevant to this action, Georgia law should govern her claim. (ECF No. 96 at 32.) Moreover, she contends that even under Pennsylvania law, she is not required to offer the statements of experts at the pleading stage, and she has alleged that GEO and Wigen engaged in extreme and outrageous conduct because they denied her the ability to exercise a fundamental constitutional right. (*Id.* at 31.)

### 2. Pennsylvania Law Governs Beckford's IIED Claim

The Court must first determine whether Pennsylvania or Georgia law governs Beckford's IIED claim.

A federal court "exercising federal question jurisdiction over a federal claim and supplemental jurisdiction over related state law claims applies the choice-of-law rules of the state of the forum." *Neopart Transit, LLC v. Management Consulting, Inc.,* No. 16-3103, 2017 WL 714043, at *11 (E.D. Pa. Feb. 23, 2017); *see also Rohm and Hass Co. v. Adco Chem. Co.,* 689 F.2d 424, 429 (3d Cir. 1982) (stating that "a federal court whose jurisdiction over a state claim is based on diversity … or on pendency to a federal claim … must apply the conflicts of law principles of the forum state."). Therefore, the Court will apply Pennsylvania's choice of law principles to determine whether Pennsylvania or Georgia's law governs Beckford's IIED claim.

In conducting a choice of law analysis, Pennsylvania courts first consider whether there is a "true conflict" between the laws of the states with an interest in the case. *Melmark, Inc. v. Schutt by and Through Schutt,* 206 A.3d 1096, 1104 (Pa. 2019). If a true conflict exists between the laws of those states, Pennsylvania courts then examine "which state has the most significant relationship to the occurrence and the parties." *Id.* at 1105–07.

At the first step of the analysis, the Court notes that it appears that Pennsylvania law requires physical injury for IIED claims, while Georgia law does not. *Compare Reedy v. Evanson,* 615 F.3d 197, 231 (3d Cir. 2010) (noting that Pennsylvania law requires a plaintiff to have suffered some type of resulting physical harm in order to bring a claim for IIED),

*with Jones v. Fayette Family Dental Care, Inc.,* 718 S.E.2d 88, 90 (Ga. Ct. App. 2011) (noting that Georgia allows a plaintiff to bring a claim for IIED in the absence of physical impact to the plaintiff if the conduct in question was directed at the plaintiff). Therefore, the Court finds that there is a true conflict between Pennsylvania's law pertaining to IIED and Georgia's law pertaining to IIED. *Doe v. Garabedian,* No. 19-1539, 2019 WL 4885959, at *4 (E.D. Pa. Oct. 2, 2019) (holding that there was a true conflict where Pennsylvania law required physical injury for IIED claims and the other three states with an interest in the action did not) *order vacated in part on reconsideration,* No. 19-1539, 2020 WL 1244126 (E.D. Pa. Mar. 13, 2020) (vacating a separate portion of the court's earlier order).

Turning to the second step in the analysis—whether Pennsylvania or Georgia has a more significant relationship to the occurrence and the parties—the "overriding consideration is which state has 'a priority of interest in the application of its rule of law' so as to vindicate the policy interests underlying that law." *Melmark,* 206 A.3d at 732 (quoting *McSwain v. McSwain,* 215 A.3d 677, 682 (Pa. 1966)). This analysis tends to be fact-sensitive. *Id.* In conducting this analysis, the Pennsylvania Supreme Court considers factors such as: (1) the relationship between the affected parties and the states with an interest in the action, (2) where the relevant actions took place,  and (3) the location of the harm. *Id.* at 732–35.

Regarding the relationship between the affected parties and the states with an interest in the action, while Beckford was a resident of Georgia during all times relevant to her claim, (ECF No. 62 at 18), Wigen worked at MVCC (which was in Pennsylvania), (ECF No. 3 at 4), a fact that indicates he may well have lived in that state.

28

Regarding the location of the harm, although Beckford resided in Georgia, she does not state that she suffered harm within that state in any of her three complaints. (*See* ECF Nos. 4, 6, 62.) Further, Beckford regularly traveled from Georgia to Pennsylvania to visit Davis (ECF No. 62 at 3.). Beckford's Second Amended Complaint thus leaves open the *possibility* that Davis informed her that the couple could not marry *while she was in Pennsylvania,* which may well have caused her to suffer emotional distress in that state.

Therefore, Beckford's allegations with respect to the relationship between the affected parties and the states with an interest in the action, as well as the location of her harm, do not tip the scale in favor of either Pennsylvania or Georgia.

Lastly, regarding where the relevant actions took place, most, if not all of GEO and Wigen's allegedly tortious actions occurred in Pennsylvania. By way of overview, Davis submitted his written request to marry Beckford from within MVCC, and therefore, from within Pennsylvania. (*Id.* at 7.) Wigen, who worked at MVCC, sent Davis, who was housed at MVCC, a response indicating that Davis and Beckford would not be permitted to marry. (*Id.*) All of this took place within Pennsylvania. Finally, Beckford attempted to contact MVCC officials about marrying Davis, but her request was denied, presumably from inside the state of Pennsylvania. (*Id.* at 4.) And, tellingly, Beckford does not allege that GEO or Wigen committed a single action related to her IIED claim inside the state of Georgia. (*See* ECF Nos. 4, 6, 62.)

Courts applying Pennsylvania choice of law provisions often determine which state's law applies by examining where the alleged tortious conduct in the case occurred. *Marks v. Redner's Warehouse Markets,* 136 A.3d 984, 990–92 (Pa. Super. Ct. 2016) (examining

three different cases, all of which held that the law of the state where the tort occurred

governed the resolution of the claim). The fact that most, if not all, of GEO and Wigen's

allegedly tortious conduct in this case occurred inside Pennsylvania, and none of it

occurred inside Georgia, pushes this Court strongly toward the conclusion that

Pennsylvania law governs Beckford's IIED claim.

Finally, although Davis did not expressly choose to go to MVCC, GEO, in

operating a prison in Pennsylvania, and Wigen, in choosing to work within that state,

were entitled to "rely on the duties and protections" provided by Pennsylvania tort law.

*Troxel v. A.I. duPont Institute,* 636 A.2d 1179, 1181 (Pa. Super. Ct. 1994) (holding that

because the defendant-hospital "was required to follow and abide by the laws of

Delaware … [it was] entitled to rely on the duties and protections provided by Delaware

law."). This Court is reluctant to require prison officials operating a prison within one

state, and acting primarily with an eye toward a prisoner housed within that state, to

check the laws of other states before acting because a relative or loved one of the prisoner

might be impacted by their actions.

For all of these reasons, the Court holds that Pennsylvania has the most significant

relationship to the occurrence and the parties. Therefore, the Court will apply

Pennsylvania law to Beckford's claim.

### 3. Beckford Has Not Stated a Claim for IIED Because She Has Not Alleged Any Physical Harm

In order to state a plausible claim for intentional infliction of emotional distress

under Pennsylvania law, a plaintiff must allege sufficient facts demonstrating that: "(1)

the defendant's conduct was extreme and outrageous; (2) the defendant's conduct caused the plaintiff severe emotional distress; and that (3) the defendant acted intending to cause the person such distress or with knowledge that such distress was substantially certain to occur." *Ghrist v. CBS Broadcasting, Inc.,* 40 F. Supp. 3d 623, 630 (W.D. Pa. 2014). Liability for intentional infliction of emotional distress "'has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Reedy,* 615 F.3d at 231–32 (quoting *Field v. Phila. Elec. Co.,* 565, A.2d 1170, 1184 (Pa. Super. Ct. 1989)). In addition, a plaintiff must allege "that he or she 'suffer[ed] some type of resulting physical harm due to the defendant's outrageous conduct,' which must be supported by competent medical evidence." *Ghrist,* 40 F. Supp. 3d at 630 (quoting *Reedy,* 615 F.3d at 231); *see also Fewell v. Besner,* 664 A.2d 577, 582 (Pa. Super. Ct. 1995) ("A plaintiff must also show physical injury or harm in order to sustain a cause of action for intentional infliction of emotional distress.").[8]

---

[8] The Court notes that in 2016, the Pennsylvania Superior Court indicated that the Pennsylvania Supreme Court has never held that a claimant must allege physical harm as part of a claim for IIED. *Gray v. Huntzinger,* 147 A.3d 924, 928 n. 3 (Pa. Super. Ct. 2016) (calling the court's decision in *Fewell* a "misread[ing]" of the Pennsylvania Supreme Court's seminal decision in the realm of IIED). However, a decision of a panel of the Superior Court remains viable precedent until it is overturned by an *en banc* panel of the Superior Court, or by a decision of the Pennsylvania Supreme Court. *Haun v. Cmty. Health Systems, Inc.,* 14 A.3d 120, 125 n. 1 (Pa. Super. Ct. 2011). This Court is not aware of either a decision by an *en banc* panel of the Superior Court or a decision of the Pennsylvania Supreme Court overturning *Fewell.* Therefore, because the Pennsylvania Supreme Court has not clearly spoken on this issue; because *Fewell* remains viable precedent, even in light of *Gray;* and because the Third Circuit has indicated, in line with *Fewell,* that physical harm is an element of a claim for IIED, *Reedy,* 615 F.3d at 231, this Court finds that Beckford must allege physical harm in order to recover for IIED. *See also Miler v. County of Centre,* 702 F. App'x 69, 74 n. 7 (3d Cir. 2017) (holding that the plaintiff's IIED claim failed because she did not allege physical harm).

Here, Beckford has consistently stated that GEO and Wigen's actions caused her emotional distress. (ECF No. 3 at 30; ECF No. 6 at 14; ECF No. 62 at 4.) Beckford also stated that her injuries included "stress, anxiety, hospitalization, and long term medical issues." (ECF No. 62 at 19.) However, Beckford has never alleged that she experienced any resulting physical harm due to GEO and Wigen's conduct. Further, Beckford has not alluded to any "competent medical evidence" of any harm that she experienced—whether physical or emotional. *Ghrist*, 40 F. Supp. 3d at 631. Therefore, because Beckford has not alleged that she suffered any physical harm as a result of GEO and Wigen's conduct, and because she has not alluded to any competent medical evidence of any physical or emotional harm, the Court holds that she has not stated a valid claim for IIED under Pennsylvania law. Accordingly, the Court will dismiss Beckford's IIED claim.

### D. Counts Four and Five: Plaintiffs' Section 1983 Claims

#### 1. The Parties' Arguments

With respect to Plaintiffs' claims under Section 1983, O'Neill and Mellendick contend that they were acting under color of federal law, not state law. (ECF No. 87 at 28.) Therefore, they argue that they cannot be held liable under Section 1983. (*Id.* at 28–29.) GEO and Wigen advance a substantially similar argument. (ECF No. 90 at 16–17.)

In response, Davis and Beckford argue that since GEO and Wigen contend that they were not acting under color of federal law, and they must have been acting under color of some law in order to have denied Davis and Beckford the right to marry, it follows that they must have been acting under color of state law. (ECF No. 96 at 32.) Further, Davis and Beckford contend that GEO and Wigen were acting under color of

state law because the nature and character of their actions demonstrates as much. (*Id.* at 33.) Finally, Davis and Beckford state that because GEO and Wigen were acting under color of state law, and because O'Neill and Mellendick conspired with GEO and Wigen to deny Davis and Beckford the right to marry, O'Neill and Mellendick were also acting under color of state law. (*Id.* at 34.)

### 2. The Requirements of Section 1983

Plaintiffs bring their claims at Count IV and Count V pursuant to 42 U.S.C. § 1983. (ECF No. 62 at 19–21.) Section 1983 "imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman ex rel. Shertzer v. Penn Manor School Dist.*, 422 F.3d 141, 146 (3d Cir. 2005) (citing *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000)). To establish valid claims under § 1983, "the plaintiff must demonstrate that the defendants, while acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States." *Id.* (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)). Indeed, claims "under Section 1983 require action taken under color of state, not federal law." *Davis*, 962 F.3d at 115 (holding that the Plaintiffs' Section 1983 claim could not stand because all defendants were alleged to have been federal actors or to have acted under color of federal law).

### 3. All Defendants Were Acting Under Color of Federal Law

Here, as noted earlier, GEO operated MVCC pursuant to a contract with the United States and under the supervision of the BOP. *See supra* Section VI.B.2. Therefore, GEO, and Wigen as its employee, only had authority to prevent Davis and Beckford from marrying

33

because the federal government had delegated that authority to GEO, and, in turn, Wigen. Accordingly, both GEO and Wigen were federal actors.

Further, O'Neill's alleged participation in the conspiracy to deny inmates at MVCC the right to marry was in his capacity as "the official overseeing deportation from that facility," which he carried out as the "Assistant Field Officer Director of the Philadelphia Field Office of ICE, DHS," and Mellendick's alleged participation was in her capacity as "the administrator of the BOP Privatization Branch, which oversees private prisons such as MVCC." (ECF No. 62 at 10.) Both of these individuals were therefore acting under the color of federal law.

Regarding Davis and Beckford's contention that even if GEO and Wigen were federal officials, they nonetheless acted pursuant to state law, the case to which Davis and Beckford refer this Court provides that "courts finding that a *federal* official has acted under color of state law have done so only when there is evidence that federal and state officials engaged in a conspiracy or 'symbiotic' venture to violate a person's rights under the Constitution or federal law." *Strickland on Behalf of Strickland v. Shalala,* 123 F.3d 863, 867 (6th Cir. 1997). Here, GEO and Wigen did not conspire with state officials because O'Neill and Mellendick were not state officials. In like fashion, O'Neill and Mellendick did not conspire with state officials because GEO and Wigen were not state officials. Therefore, none of the Defendants were acting under color of state law.

For all of the foregoing reasons, the Court holds that all Defendants acted under color of federal law. Accordingly, none of them can be liable under Section 1983. *Davis,* 962

F.3d at 115. Therefore, the Court will dismiss Counts IV and V of Plaintiffs' Second Amended Complaint.

**VII.     Scope of Dismissal**

When a district court dismisses one or more claims pursuant to Rule 12(b)(6), the court must permit the plaintiff the opportunity to amend the complaint unless amendment would be inequitable or futile. *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citation omitted). Here, the Court finds that Counts I, II, IV, and V of the Second Amended Complaint, as analyzed above, cannot be cured by amendment. Therefore, the Court will dismiss those counts with prejudice without leave to amend. In doing so, the Court notes that Plaintiffs have already filed three Complaints. (ECF Nos. 3, 6, 62.)

However, the Court will grant the Plaintiffs leave to amend with respect to their IIED claim (Count III). Because the Court lacks subject matter jurisdiction over Plaintiffs' IIED claim against the United States, it will only permit the Plaintiffs to amend their IIED claim as against GEO and Wigen.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRIAN A. DAVIS and FREDRICKA K. BECKFORD,** )<br>)<br>) | **Case No. 3:16-cv-26** |
| Plaintiffs, )<br>) | **JUDGE KIM R. GIBSON** |
| **v.** )<br>) | |
| **THE GEO GROUP, INC.; GEORGE C. WIGEN, FORMER WARDEN, MOSHANNON VALLEY CORRECTIONAL CENTER; DONNA MELLENDICK, FORMER ADMINISTRATOR, BUREAU OF PRISONS PRIVATIZATION MANAGEMENT BRANCH; and DAVID O'NEILL, ASSISTANT FIELD DIRECTOR, DEPARTMENT OF HOMELAND SECURITY,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. ) | |

## ORDER

**AND NOW,** this 25th day of October, 2021, upon consideration of Defendants David O'Neill and Donna Mellendick's Motion to Dismiss Plaintiffs' Second Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (ECF No. 86), **IT IS HEREBY ORDERED** that the motion is **GRANTED.**

**IT IS FURTHER ORDERED** that upon consideration of Defendants Geo Group, Inc. and G.C. Wigen's Motion to Dismiss Plaintiffs' Second Amended Complaint, (ECF No. 89), the motion is **GRANTED.**

**IT IS FURTHER ORDERED** that Counts I, II, IV, and V of Plaintiffs' Second Amended Complaint are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the Plaintiffs' IIED claim (Count III), as against GEO and Wigen, is **DISMISSED WITHOUT PREJUDICE.** Plaintiffs shall have until <u>November 22, 2021</u> to file a Third Amended Complaint.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE